MARC J. FAGEL (Cal. Bar. No. 154425)
ROBERT L. TASHJIAN (Cal. Bar No. 191007)
  tashjianr@sec.gov
ERIN SCHNEIDER (Cal Bar No. 216114)
  schneidere@sec.gov
KAREN KREUZKAMP (Cal. Bar No. 246151)
  kreuzkampk@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>       **Plaintiff,**<br><br>    v.<br><br>**BLAKE R. WELLINGTON and DANIEL J. VANCE**<br><br>       **Defendants.** | Case No. _____<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

### SUMMARY OF ACTION

1. This is an insider trading case in which two information technology ("IT") specialists learned about confidential merger negotiations while providing technical assistance to their company's CEO and improperly used the information for their own personal profit.

COMPLAINT

2.      On December 16, 2009, defendant Daniel Vance, an employee of Clear One Health Plans, Inc. ("Clear One"), was asked by Clear One's CEO to help resolve an e-mail issue. While doing so, Vance saw confidential merger documents being sent to the CEO of PacificSource Health Plans ("PacificSource"), which was in negotiations to acquire Clear One. Vance informed his supervisor, defendant Blake Wellington. Vance and Wellington purchased Clear One shares the very next day.

3.      On December 30, 2009, Clear One announced the merger. Clear One's stock price skyrocketed by more than 150 percent on the news. Wellington and Vance immediately began selling their Clear One shares. For Clear One shares purchased after December 16, 2009, Wellington profited by $55,891.50 and Vance profited by $17,509.75.

4.      By engaging in the acts alleged in this Complaint, Wellington and Vance violated the antifraud provisions of the federal securities laws, and unless retrained and enjoined, defendants will continue to engage in the acts, practices, and courses of business alleged herein, or in acts, practices, and courses of business of similar purport and object. The Commission therefore seeks an order enjoining Wellington and Vance from future violations of the federal securities laws, requiring them to disgorge their ill-gotten gains with prejudgment interest, and requiring them to pay civil monetary penalties.

## JURISDICTION, VENUE, AND DIVISIONAL VENUE

5.      The Commission brings this action pursuant to Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6. Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

7. Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a substantial part of the events or omissions that give rise to claims alleged in this Complaint occurred in this district. Assignment to the Eugene Division is appropriate because most of the illicit activities occurred in Bend, Oregon, in Deschutes County.

## DEFENDANTS

8. Defendant Blake R. Wellington, 46, resides in Hillsboro, Oregon. During all relevant times, he was a supervisor in Clear One's IT department. One of his direct reports was Daniel Vance. Wellington's responsibilities included overseeing the IT help desk, including reviewing, monitoring, and responding to any requests for IT assistance by Clear One's employees. Wellington was employed by Clear One from January 2009 through May 10, 2010.

9. Defendant Daniel J. Vance, 40, resides in Bend, Oregon. During all relevant times, he was employed in Clear One's IT department, and responding to IT help desk requests was part of his job responsibilities. He began working at Clear One in January 2008 and remains employed by PacificSource.

## OTHER RELATED ENTITIES

10. Clear One, a health insurance provider, was an Oregon corporation with its principal place of business in Bend, Oregon. On May 21, 2010, Clear One became a wholly-owned subsidiary of PacificSource. Before May 21, 2010, Clear One's common stock was quoted on the OTC Bulletin Board under the symbol CCHN. As of December 31, 2009, Clear One had assets of $75.3 million.

11. PacificSource is an Oregon nonprofit corporation headquartered in Springfield, Oregon. It is authorized to do business as a health care service contractor. As of December 31, 2009, PacificSource had assets of $177 million.

## FACTUAL ALLEGATIONS

**A. In October 2009, Wellington and Vance Began Buying Clear One Shares.**

12. On Friday, October 16, 2009, the Clear One Board of Directors and certain executives held a conference call to discuss the terms of a potential acquisition by PacificSource.

13. Shortly thereafter, on Monday, October 19, 2009, Wellington opened a trading account at E-Trade, which he began using on October 22, 2009 to buy Clear One shares. Vance began buying Clear One shares on November 5, 2009. Neither Wellington nor Vance had ever previously purchased Clear One shares.

14. Wellington and Vance took unusual steps to finance their purchases of Clear One shares. For example, Wellington borrowed $4,000 from his 401(k) retirement account, money he used to purchase Clear One shares. In addition, he opened a credit card account that he only used to write a $10,000 convenience check to buy Clear One shares.

15. Wellington also applied for a loan from an online peer-to-peer lending site. He identified the purpose of loan as "Investing in a local business with great prospects. I have an opportunity to invest in a corporation with a GREAT price to book ratio. I estimate that I will be able to pay the loan completely off within 3 to 6 months." Wellington ultimately obtained a $25,000 loan from the site, all of which he used to buy Clear One shares.

16. Vance, who had previously filed for bankruptcy and only recently emerged on October 19, 2009, borrowed $5,285 from his 401(k) retirement account, sold personal computer equipment, and sold his truck to finance his purchases of Clear One shares.

### B. In December 2009, Wellington and Vance Used Material, Non-Public Information to Purchase Additional Clear One Shares.

17. On December 16, 2009, Clear One's CEO and a corporate communications employee working on the potential merger with PacificSource attempted to send e-mail messages with attachments to the CEO and others at PacificSource. The attachments to these e-mail messages included important information about the merger including a proposed deal timeline and draft communications messages. The draft communications messages included media talking points and suggestions on how to answer questions from Clear One employees regarding the merger.

18. Both the Clear One CEO and the corporate communications employee experienced technological difficulties in their attempts to send these documents. Clear One's CEO contacted the IT help desk via e-mail regarding the issue.

19. Vance responded to the CEO's request for assistance that same day by going to her office and working on her computer. After reviewing the merger e-mails and attachments in the CEO's office, Vance diagnosed the problem and advised the CEO to resend the e-mail messages and their attachments after zipping the files and adding the word "Confidential" to the e-mails.

20. The CEO sent Vance to the corporate communications employee who was experiencing the same problem. Vance assisted her as well.

21. Later that day, Vance told Wellington, his supervisor, about the CEO's difficulty in sending the merger e-mails and attachments to PacificSource and his resolution of the problem.

22. After responding to the December 16 IT help desk ticket, Wellington and Vance were in possession of material, nonpublic information regarding the planned merger of Clear

One and PacificSource. Based on this material, nonpublic information, Wellington and Vance immediately purchased more Clear One shares. Wellington bought an additional 3,771 shares on December 17, 18, and 24 at prices ranging from $10.25 to $10.50 per share. Vance bought an additional 1,225 shares on December 18 and 29 at prices ranging from $9.75 to $10.35 per share.

23. Wellington and Vance knew, or were reckless in not knowing, that the information they learned regarding the potential merger was material, nonpublic information. Each knew, or was reckless in not knowing, that he had a duty to Clear One, his employer, to keep the information confidential. Each had signed a confidentiality agreement with Clear One, whereby each agreed he would use and disclose confidential, privileged, or proprietary information, including financial data and corporate information, only in connection with and for the purpose of performing their assigned duties. Both Wellington and Vance chose to disregard this duty so that they could personally profit by way of an unfair advantage over Clear One's other current and prospective shareholders.

### C. Wellington and Vance Earned Significant Profits by Selling Their Clear One Shares as Soon as the Merger Was Announced.

24. Clear One announced the merger with PacificSource via a press release on December 30, 2009, after the market closed. The press release stated that Clear One shareholders would receive $26.00 per share in cash. In the months leading up to the announcement, Clear One shares had been quoted on the OTCBB at around $10.50 per share, and had closed at $10.10 per share the day of the announcement. On the day after the announcement, Clear One's share price spiked to $25.25, and Wellington and Vance immediately began selling their Clear One stock.

25.     For their purchases of Clear One shares made after December 16, 2009, the date they learned of the impending merger, Wellington profited by $55,891.50 and Vance profited by $17,509.75.

## CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

26.     The Commission incorporates and realleges here paragraphs 1 through 25.

27.     By engaging in the acts and conduct alleged above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

28.     By reason of the foregoing, Defendants have violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enjoin Defendants Blake Wellington and Daniel Vance from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], thereunder.

II.

Order Defendants Blake Wellington and Daniel Vance to disgorge the ill-gotten gains derived from their illegal trading, plus prejudgment interest.

III.

Order Defendants Blake Wellington and Daniel Vance to pay civil money penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

IV.

Granting such other and further relief as the Court deems just and proper.

Dated: January 30, 2013

Respectfully submitted:

By: *Karen Kreuzkamp*
Karen Kreuzkamp

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION